BANK BRUSSELS LAMBERT,
Plaintiff–Appellant,

v.

FIDDLER GONZALEZ & RODRI-
GUEZ, Defendant–Appellee.

Docket No. 01–9026.

United States Court of Appeals,
Second Circuit.

Argued: April 25, 2002.

Decided: Sept. 20, 2002.

Lance Gotthoffer, Oppenheimer Wolff & Donnelly LLP, New York, New York (Christopher W. Jones, on the brief), for the appellant.

Robert E. Kushner, D'Amato & Lynch, New York, New York (Peter A. Stroili, on the brief), for the appellee.

Before: F.I. PARKER, STRAUB and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

This case returns to us a second time following proceedings on remand from this Court in the United States District Court for the Southern District of New York (McKenna, J.). In our prior opinion, we vacated the district court's dismissal of the complaint for lack of personal jurisdiction, holding that the district court erred when it determined that the situs of the alleged injury was outside of New York for purposes of CPLR § 302(a)(3), and we remanded for further consideration of the personal jurisdiction question. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 794 (2d Cir.1999) ("*BBL I*"). On remand, the district court held that personal jurisdiction was proper under New York law but that the exercise of this jurisdiction over the defendant would not comport with federal due process constraints. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, No. 96 Civ. 7233, 2001 WL 893362 (S.D.N.Y. Aug. 8, 2001) ("*BBL II*"). While we agree with the district court that the New York long-arm statute provides jurisdiction over the defendant, we do not agree that the exercise of personal jurisdiction over the defendant in this case violates due process. Accordingly, we vacate and remand, again.

## BACKGROUND

The underlying facts in the dispute in this case are laid out in detail in our prior

opinion, familiarity with which is assumed. *BBL I,* 171 F.3d at 781–84.

In brief, in November 1989, plaintiff-appellant Bank Brussels Lambert ("BBL"), a Belgian banking corporation, joined a five-member lending group led by The Chase Manhattan Bank, N.A. ("Chase New York") that negotiated a secured $245 million revolving credit agreement with two oil companies, collectively known as "Arochem." The primary collateral put up by Arochem was to be its petroleum refinery in Puerto Rico. Chase New York recommended to the lending group that it retain defendant Fiddler Gonzalez & Rodriguez ("Fiddler"), a Puerto Rican law firm, as local counsel for the limited purpose of providing an opinion letter as to the validity and enforceability of the security interest being acquired by the lending group. Fiddler provided the requested opinion letter to the lending group, and the loan closed on January 17, 1990. Five days later, as per the terms of the credit agreement, BBL disbursed $75 million from its New York branch to Arochem.

On December 23, 1991, Arochem defaulted on the loan. Shortly thereafter, Will Harris, the president and majority shareholder of Arochem, was convicted of multiple counts of bank fraud, and during those proceedings it came to light that Arochem may have systematically misreported its assets to the lending group. BBL sued Chase New York for fraud and breach of contract, and during discovery in that case it inadvertently came to light that Fiddler had received documents in an unrelated representation of Chase Manhattan's Puerto Rico branch ("Chase Puerto Rico") which suggested that Arochem was fraudulently manipulating its accounting and financial reports. BBL then commenced the instant suit against Fiddler for breach of fiduciary duty and breach of contract.

Fiddler moved in the district court to dismiss the complaint for lack of personal jurisdiction, which the district court granted in an opinion and order dated April 17, 1998. The district court held that none of the bases for jurisdiction set out in New York's long-arm statute, CPLR § 302, were satisfied.

In *BBL I,* we agreed with the district court except with respect to § 302(a)(3), which applies to persons who commit a tortious act outside New York which causes injury inside the state. *Id.* at 786–93. Contrary to the district court, we determined that if BBL had sufficiently averred a tort by Fiddler, the situs of the injury alleged was New York, as the location where the "first effect of the tort"—namely, the disbursement of funds to Arochem by BBL's New York branch—took place. *Id.* at 790–93. We therefore remanded to the district court for it to determine: (1) whether BBL had sufficiently averred facts constituting a tort; (2) if so, whether the remaining requirements of CPLR § 302(a)(3) had been satisfied; and (3) if so, whether exercise of jurisdiction would comport with the requirements of federal due process. *Id.* at 794.

On remand, the district court determined, first, that BBL's complaint had made out a legally sufficient claim for legal malpractice under Puerto Rican law. *BBL II,* 2001 WL 893362, at *2–*3. Specifically, the district court held that Fiddler's duty of loyalty to its client BBL might have required Fiddler, upon learning of Arochem's financial manipulations, to either disclose that information or, if Fiddler could not do so because that information was privileged, to withdraw from representation of the lending group. *Id.* at *1. Although the district court expressed skepticism as to whether BBL could ever prove causation, it held sufficient BBL's allegation that, had Fiddler withdrawn,

BBL would have refused to participate in the credit agreement. *Id.* at *3.

Turning to the two subsections of CPLR § 302(a)(3), the district court next held that subsection (ii), which relates to whether the defendant should reasonably have expected its acts to have consequences in New York, was not satisfied because Fiddler had not sought out the representation and had therefore not purposefully affiliated itself with New York. *Id.* at *4. However, with respect to subsection (i), the district court held that Fiddler's longtime maintenance of an apartment in New York counted as a "persistent course of conduct" and that therefore personal jurisdiction under the long-arm statute had been established. *Id.* at *3.

Addressing the final question of federal due process, however, the district court held that it could exercise neither specific nor general jurisdiction over the defendant because the "minimum contacts" threshold had not been satisfied. *Id.* at *5–*7. With respect to general jurisdiction, the court held that Fiddler's contacts with New York were insufficiently continuous and systematic. *Id.* at *6–*7. With respect to specific jurisdiction, the court held that because Fiddler had not specifically sought out the representation which gave rise to the claim, Fiddler had not purposefully availed itself of the privilege of doing business in New York. *Id.* at *5. Because the district court found that the minimum-contacts test had not been satisfied, it did not reach the issue of whether the exercise of personal jurisdiction over Fiddler would be reasonable. *Id.* at *7. The district court, therefore, again dismissed the complaint for lack of personal jurisdiction, and this appeal followed.

### DISCUSSION

■ With exceptions not relevant here, a district court sitting in a diversity action such as this may exercise personal jurisdiction to the same extent as the courts of general jurisdiction of the state in which it sits. Fed.R.Civ.P. 4(k)(1)(A). Accordingly, resolution of a motion to dismiss for lack of personal jurisdiction made in the Southern District of New York requires a two-step analysis. First, the court must determine if New York law would confer upon its courts the jurisdiction to reach the defendant, which in this case could only be possible under the New York long-arm statute, CPLR § 302. If there is a statutory basis for jurisdiction, the court must then determine whether New York's extension of jurisdiction in such a case would be permissible under the Due Process Clause of the Fourteenth Amendment. *BBL I*, 171 F.3d at 784. We review a district court's dismissal for want of personal jurisdiction *de novo*. *Id.*

### I. Long–Arm Jurisdiction under CPLR § 302(a)(3)

■ As noted, the only statutory ground on which we remanded to the district court for further proceedings was CPLR § 302(a)(3). This provision states as follows:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

. . . .

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he . .

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

CPLR § 302. Because there is no dispute that the "act" forming the basis of the plaintiff's complaint, namely, the failure of Fiddler to either inform BBL of the Arochem allegations of which it became aware or to withdraw as counsel, took place outside New York, and because we held in our first opinion that the injury allegedly caused by this act occurred in New York for § 302(a)(3) purposes, *BBL I,* 171 F.3d at 792, it remained for the district court only to determine, first, whether plaintiff sufficiently alleged that the act was "tortious," and second, whether plaintiff satisfied either (or both) of subsections (i) and (ii).

In order to satisfy the first element, plaintiff had to aver facts constituting "a tort under the law of the pertinent jurisdiction." *Id.* at 786. Because both parties have assumed that the law of Puerto Rico rather than New York governs whether the acts alleged are tortious, and neither side has identified any material difference between the two jurisdictions' laws in this regard, we will likewise so assume, without deciding, which jurisdiction's law is the proper one. We are also mindful of the fact that the inquiry at this stage is the preliminary question of jurisdiction, distinct from an inquiry into ultimate liability on the merits, *see Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 460, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), thus plaintiff need not actually prove that defendant committed a tort but rather need only state a colorable cause of action. *See* Vincent C. Alexander, *Practice Commentaries,* C302:5, 7B McKinney's Consol. Laws of N.Y. 134 (2001).

The district court held that plaintiff had stated a colorable tort claim under the law of Puerto Rico for legal malpractice based on an attorney's duty of loyalty to his client. *BBL II,* 2001 WL 893362, at *2. We agree. As the district court correctly noted, Puerto Rican courts have determined that a conflict may arise where, in the course of successive or simultaneous representations of clients, "the adequate representation of a subsequent or simultaneous client may require disclosure of the other client's confidences." *Id.* at *2 (quoting *In re Belen Trujillo,* 126 D.P.R. 743, 754 (1990) (English trans.)) Upon discovering such a conflict, the attorney must withdraw from the representation without divulging any confidential communications. *Id.*

Defendant Fiddler does not dispute this as a correct statement of the law with regards to representational conflicts in Puerto Rico. It argues, rather, that because it was retained only for the limited purpose of providing an opinion letter on the security interest being provided to the lenders, the information Fiddler received about Arochem's financial dealings fell beyond the scope of its representation and therefore presented no conflict requiring its withdrawal. Fiddler has not presented and we have not found any law, regulation or judicial opinion suggesting that Puerto Rico, or any other jurisdiction for that matter, would take such a miserly view of an attorney's duty of loyalty to his or her client. Fiddler likely had no duty to seek out information beyond what was necessary for the limited task for which it was retained, but plaintiff's tort allegations here invoke Fiddler's obligations once information material to the business decisions of Fiddler's clients came into Fiddler's possession, not any broader affirmative duty to investigate.[1]

---

1. This point distinguishes the case on which defendant primarily relies, *Macawber Eng'g,*

As the district court concluded, the plaintiff's assertion that "Fiddler, as BBL's attorney, was obligated to disclose the Chase Puerto Rico information as relevant to [BBL's] decision with respect to the RCA loan, thus creating a conflict that should have led it to withdraw from representation of both clients .... sufficiently alleges a breach of duty that gives rise to a claim for legal malpractice." *Id.* As stated above, we need not finally decide the merits of plaintiff's malpractice action; it suffices that plaintiff has stated a colorable tort claim so as to give the district court jurisdiction to determine the merits.[2]

Turning to the two subsections of § 302(a)(3), the district court found that subsection (i) had been satisfied by Fiddler's "persistent course of conduct" in New York of renting of an apartment for some eight years in Manhattan. *Id.* at *3. This apartment was available for the use of the firm's partners, and, while it had apparently been largely used for vacations, defendant admits that at times the apartment was used for firm business and the firm claims the apartment as a business expense. *BBL I,* 171 F.3d at 782. We therefore agree that this long-term apartment rental was sufficient to constitute a persistent course of conduct by the firm. Although this jurisdictional predicate has not often been expounded upon in the New York courts, there is nothing in the plain language of § 302(a)(3)(i) which suggests

that the relevant contacts must be solely business-related; in fact, this predicate's juxtaposition as an alternative to "regularly do[ing] or solicit[ing] business" suggests precisely the opposite. *See also David Tunick, Inc. v. Kornfeld,* 813 F.Supp. 988, 991 (S.D.N.Y.1993) (considering both business and non-business activities of art dealer); *In re Union Carbide Corp. Consumer Prods. Bus. Secs. Litig.,* 666 F.Supp. 547, 571 (S.D.N.Y.1987) (listing defendant's leisure travel and negotiation of personal loan in addition to business-related meetings); *Granada Television, Int'l, Ltd. v. Lorindy Pics. Int'l Inc.,* 606 F.Supp. 68, 72 n. 5 (S.D.N.Y.1984) ("[T]he persistent course of conduct may involve a great range of human activity which, while it might fall beyond the pale of 'business' conduct, would, because of its consistency, serve as a solid link of jurisdiction to New York.") (quoting J. McLaughlin, *Practice Commentary, § 302,* McKinney's Consol. Laws of N.Y. (1972)). Nor do we accept the defendant's argument that, despite the fact that this apartment was maintained by the firm both for business purposes and as compensation to its members, these contacts should not be imputed to the firm.

■ Defendant argues that "to read CPLR 302(a)(3)(i) as somehow providing a basis for long-arm jurisdiction based on the mere rental of an apartment in a hotel would render that provision unconstitutional." Of course, it is not the "mere

---

*Inc. v. Robson & Miller,* 47 F.3d 253 (8th Cir.1995). The *Macawber* court held that a claim for negligence based on an alleged failure to act is viable only where counsel had a duty to act, and that local counsel had no duty to take steps in a litigation beyond the limited scope of its representation. *Id.* at 256–57. The existence of the duty alleged to have been breached here, however, hinges not on the scope of the agreed representation but rather on an ethical duty attendant to every representation.

2. We similarly agree with the district court that the plaintiff has stated a colorable claim with respect to causation. It is not inherently implausible that, had Fiddler withdrawn representation prior to the closing, even without divulging the communications from Chase Puerto Rico, BBL would have at least inquired into the reasons and this inquiry may have led to BBL's withdrawal. Whether BBL can ever prove this is, of course, another matter.

rental" that satisfies § 302(a)(3)(i), it is the long-term (i.e., "persistent") rental and use, coupled with the commission of a tortious act causing injury in New York, which confers long-arm jurisdiction. Moreover, as the New York Court of Appeals has made clear, the constitutional analysis is a distinct step from the statutory one; it is only once the long-arm statute is deemed satisfied that the court need examine whether due process is likewise comported with. *LaMarca v. Pak–Mor Mfg. Co.*, 95 N.Y.2d 210, 214, 713 N.Y.S.2d 304, 735 N.E.2d 883 (2000).

Finding long-arm jurisdiction to be present under CPLR § 302(a)(3)(i), we have no need to determine whether it is also present under § 302(a)(3)(ii).[3]

## II. Due Process

Having determined that the New York long-arm statute would extend the state's jurisdiction over defendant in this case, we turn to whether the exercise of this jurisdiction comports with federal due process. To do so, we undertake an analysis consisting of two components: the "minimum contacts" test and the "reasonableness" inquiry. *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996).

 The first of these tests asks whether the defendant "has 'certain minimum contacts [with the forum] ... such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *U.S. Titan, Inc. v.*

*Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir.2001) (quoting *Calder v. Jones*, 465 U.S. 783, 788, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)) (alteration in original; some internal quotation marks omitted). Where "the claim arises out of, or relates to, the defendant's contacts with the forum"—i.e., specific jurisdiction—minimum contacts exist "where the defendant 'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court' there." *Id.*; *accord Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). A state may assert "general jurisdiction"—i.e., jurisdiction irrespective of whether the claim arises from or relates to the defendant's forum contacts—only where these contacts are "continuous and systematic." *U.S. Titan*, 241 F.3d at 152; *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

We have no quarrel with the district court's conclusion that general jurisdiction could not be maintained over defendant in these circumstances. *BBL II*, 2001 WL 893362, at *6–*7. With regard to specific jurisdiction, however, the district court took too narrow a view of the relevant contacts.

 The district court focused on the contacts which directly gave rise to the cause of action:

---

**3.** The district court held that there was no jurisdiction under § 302(a)(3)(ii) because Fiddler's contacts did not show purposeful availment-a requirement which, while not obviously present in the statute, the district court felt was mandated by our decision in *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236 (2d Cir. 1999). *BBL II*, 2001 WL 893362, at *4. Subsequent to *Kernan*, however, the Court of Appeals decided *LaMarca*, in which "purposeful availment" is not made a part of the court's

§ 302(a)(3)(ii) analysis, *LaMarca*, 95 N.Y.2d at 214–16, 713 N.Y.S.2d 304, 735 N.E.2d 883, but rather only a part of its constitutional determination, *id.* at 216–19, 713 N.Y.S.2d 304, 735 N.E.2d 883. Because we do not ultimately reach the question of whether jurisdiction is proper under § 302(a)(3)(ii), we need not decide whether the district court was correct in its reading of *Kernan* and, if so, whether *Kernan* has been effectively overruled by *LaMarca*.

BBL argues that because Fiddler's opinion was a condition precedent to the RCA, a New York-based loan transaction, and addressed to the banks care of Chase in New York and because Fiddler communicated with the banks and their counsel, all located in New York, regarding the opinion, Fiddler has sufficient New York contacts to support a finding of specific jurisdiction. Again, nothing about any of these contacts demonstrates Fiddler's purposeful availment of the New York forum. Fiddler did not solicit the banks to be retained for the opinion letter, the opinion letter solely concerned issues of Puerto Rico law and the other New York contacts such as communication by telephone, fax and mail are incidental to its unsolicited representation of New York based clients.

*Id.* at *5 (citation omitted). Were these the only contacts relevant to the jurisdictional determination, we might very well agree with the district court that no purposeful availment had been demonstrated. However, there were other contacts between defendant and New York. As noted above, Fiddler maintained an apartment in New York at least partially (and, judging by its being accounted for as a business expense, perhaps even primarily) for the purpose of better servicing its New York clients. *BBL I,* 171 F.3d at 782. Fiddler also faxed newsletters regarding Puerto Rican legal developments to numerous persons in New York. *BBL II,* 2001 WL 893362, at *6. The record also shows that Fiddler has performed work for numerous New York clients and New York law firms, *BBL I,* 171 F.3d at 782, and in its marketing materials the firm has touted, *inter alia,* its "close relationship with the Federal Reserve Bank of New York."

The district court considered some of these contacts under its general jurisdiction analysis, but did not do so with respect to specific jurisdiction. Yet, while these contacts may not have directly given rise to the plaintiff's cause of action, they certainly "relate to" it. Law firms obtain new business largely through reputation and word of mouth, and thus the activities of a firm which maintains its presence and reputation in a particular legal market certainly can be said to be a proximate cause of the engagements it obtains in that market. *See Burger King,* 471 U.S. at 473–74, 105 S.Ct. 2174 (noting that "where individuals purposefully derive benefit from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities" (internal quotation marks and citations omitted)). Specifically with respect to the engagement which gave rise to the instant cause of action, we noted in our prior opinion that Fiddler had been recommended by Chase largely because Fiddler had performed well for Chase, through its Puerto Rico branch, in the past. *BBL I,* 171 F.3d at 782.

These contacts are not the kind of "random, fortuitous, or attenuated contacts" or "unilateral activity of another party or a third person" that the purposeful availment requirement is designed to eliminate as a basis for jurisdiction. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174 (internal quotation marks omitted). The engagement which gave rise to the dispute here is not simply one of a string of fortunate coincidences for the firm. Rather, the picture which emerges from the above facts is that of a law firm which seeks to be known in the New York legal market, makes efforts to promote and maintain a client base there, and profits substantially therefrom.[4]

4. The district court relied heavily on *Sher v.* *Johnson,* 911 F.2d 1357 (9th Cir.1990), for its

Under such circumstances, we see nothing fundamentally unfair about requiring the firm to defend itself in the New York courts when a dispute arises from its representation of a New York client—a representation which developed in a market it had deliberately cultivated and which, after all, the firm voluntarily undertook.

 The second part of the jurisdictional analysis asks "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." [5] *Metro. Life*, 84 F.3d at 568 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Courts are to consider five factors in evaluating reasonableness: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Id.* at 568 (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), and *Burger King*, 471 U.S. at 476–77, 105 S.Ct. 2174), *cited in Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 244–45 (2d Cir.1999); *Chaiken v. VV Publ'g Corp.*,

119 F.3d 1018, 1028–30 (2d Cir.1997). Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life*, 84 F.3d at 568 (quoting *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174). The import of the "reasonableness" inquiry varies inversely with the strength of the "minimum contacts" showing—a strong (or weak) showing by the plaintiff on "minimum contacts" reduces (or increases) the weight given to "reasonableness." *Id.* at 568–69 (citing *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174).

 Regardless of how the strength of the "minimum contacts" showing is characterized here, however, Fiddler fails to meet its required burden of proof on the five "reasonableness" factors. Fiddler's maintenance, and frequent use of, its apartment in Manhattan, together with the sizable revenue it earns from international clients, certainly belies any claim that the exercise of jurisdiction by New York will impose an undue burden on the firm under the first factor. Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because "the conveniences of modern communication and transportation ease what would

holding. *See BBL II*, 2001 WL 893362, at *5. In *Sher*, the court held that a Florida law firm which had been solicited to represent a California defendant in a Florida criminal case could not, consistent with due process, be subjected to a malpractice suit in California court solely based on the representation and the communications and travel to California incident to it. 911 F.2d at 1362–63. The *Sher* court specifically noted, however, that the defendant law firm in that case, unlike the defendant here, had "take[n] no affirmative

action to promote business within the forum state." *Id.* at 1363.

5. Although the district court did not reach the reasonableness component of the analysis, the issue remains reviewable on appeal because it was "pressed or passed upon below." *United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001) (citing James Wm. Moore, et al., 19 *Moore's Federal Practice* § 205.05[1] (3d ed.2000)) (defining "pressed or passed upon below" as "when it fairly appears in the record as having been raised or decided").

**130**

have been a serious burden only a few decades ago." *Id.* at 574. New York, as the center of the loan transaction and home to the BBL branch which disbursed the funds, has an unquestionable interest in adjudicating the claim under the second factor. (While New York's interest may be no greater than Puerto Rico's in adjudicating the responsibilities of its attorneys, it is a substantial interest nonetheless.) The third and fourth factors both implicate the ease of access to evidence and the convenience of witnesses, *id.*, an issue which both supports and undermines defendant's position given that both jurisdictions are marked with the traces of the transaction in issue. Even though many of the witnesses and much of the evidence (such as the Fiddler and Chase Puerto Rico personnel involved) will likely be located in Puerto Rico, others, such as the BBL personnel, will likely be located in New York. Defendant did not address the fifth factor, but holding defendant subject to jurisdiction in New York does not appear likely to erode any shared social policies.

In sum, defendant's showing on these factors does not convince us that this case is the "exceptional situation" where exercise of jurisdiction is unreasonable even though minimum contacts are present. *See id.* at 575, 105 S.Ct. 2174 ("[D]ismissals resulting from the application of the reasonableness test should be few and far between...."). We therefore conclude upon *de novo* review, contrary to the district court, that due process permits the exercise of personal jurisdiction over defendant in these circumstances.

### CONCLUSION

We agree with the district court that personal jurisdiction over defendant is proper under the New York long-arm statute, but, unlike the district court, we also find that the exercise of this jurisdiction is consistent with federal due process. Accordingly, we vacate the district court judgment dismissing the action and remand for further proceedings.