HORIZON MARKETING, a d/b/a of Evans Sales, Inc., and Venida Marketing Co., Plaintiffs,

v.

KINGDOM INTERNATIONAL LIMITED, Dong Ku Ra Mi Corp., Mei–Chuen Dai a/k/a John Chuen, individually, and Ko–Yu Mo a/k/a Gibson Mo, individually, Defendants.

No. 02–CV–6488(NGG).

United States District Court, E.D. New York.

Feb. 14, 2003.

David A. Adelman, Keaton & Associates, P.C., Palatine, IL, Elizabeth A. Haas, Barr & Haas, LLP, Spring Valley, NY, for Plaintiff.

Leonard Kreinces, Kreinces & Rosenberg, P.C., Westbury, NY, for Defendant.

## MEMORANDUM AND ORDER

GARAUFIS, District Judge.

Plaintiffs, unpaid sellers of produce, move this court for a preliminary injunc-tion, pursuant to Federal Rule of Civil Procedure 65, restraining defendants, pro-duce buyers, from dissipating assets that are part of a trust formed under the Per-ishable Agricultural Commodities Act, 1930, 7 U.S.C. § 499a, *et seq.* For the following reasons the preliminary injunc-tion is GRANTED as to both corporate defendants.

## FACTS AND PROCEDURAL BACKGROUND

Plaintiffs Horizon Marketing ("Hori-zon") and Venida Marketing Co. ("Veni-da") are sellers of produce in interstate commerce. (Amended Complaint ("Am. Compl."), ¶ 1.) Defendants Kingdom Inter-national Limited ("Kingdom") and Dong Ku Ra Mi Corp. ("Dong") are two New York corporations which allegedly bought large amounts of fresh fruits from plain-tiffs.[1] (*See id.*, ¶¶ 5–8.) Defendant Ko–Yu Mo ("Mo") owns 85% of defendant King-dom,[2] and 50% of defendant Dong. (*See* Transcript of Dec. 26, 2002 Hearing on Order to Show Cause for Preliminary In-junction ("Dec. 26 Tr."), at 4–5; Affidavit of Gibson Mo ("Mo Aff."), Exh. C.) Defen-dant Mei–Chuen Dai owns the remaining 15% of Kingdom.[3] The remaining 50% owner of Dong is non-party Jung Sook Kang.[4] (Mo Aff., Exh. C.)

---

1. To be clear, defendants do not dispute that Dong was a purchaser. The central dispute is whether Kingdom was also a purchaser dur-ing the relevant time period.

2. In his affidavit, Mr. Mo stated that he was the "sole principal" of Kingdom. (Mo Aff. ¶ 1.) Whether Mr. Mo in fact owns all of Kingdom, or 85% of it, is not material in light of my decision.

3. At the December 26, 2002 hearing, Defense counsel stated that the caption incorrectly states that Mei–Chuen Dai is also known as "John Chuen". (Dec. 26 Tr., at 4.) It is not entirely clear who "John Chuen" is. At one point in his testimony, Mr. Mo said that John Chuen is the sales manager for Dong. (*Id.* at 9.) Later, Mr. Mo's attorney, in an effort to clarify the record, informed the court that the name of Dong's sales manager is Ju Gil Joen, and that plaintiffs may have been confused by the similarity in the way the names sound. (*Id.* at 15.) Mr. Mo then testified that Ju Gil Joen is usually called "John". Thus, it ap-pears that plaintiffs dealt with a sales manag-er whom they believed was named "John". That person, however, is not defendant Mei–Chuen Dai.

4. The confusion in names continues, as Mr. Mo's affidavit identifies John Chuen as "the remaining principal of Dong." (Mo Aff. ¶ 5.)

The instant suit concerns various purchases of fruits from plaintiffs during September and October 2002. The amount plaintiffs claim is due for these purchases is $220,091.15. Plaintiffs maintain that they sold the produce to both Kingdom and Dong, believing that Dong was "a division or trade name of Kingdom." (Am. Compl., ¶¶ 5, 7.) Accordingly, they seek a preliminary injunction against both corporate defendants. Kingdom argues, however, that despite plaintiffs' belief, only Dong bought the produce and only Dong should be subject to the injunction.

 The sales of produce in this case are subject to the Perishable Agricultural Commodities Act, 1930, ("PACA"), 7 U.S.C. § 499a, *et seq.* Under § 5(c) of PACA, 7 U.S.C. § 499e(c), buyers of produce subject to PACA are required to hold proceeds from the sale of such produce in trust for the benefit of the sellers. *See* 7 U.S.C. § 499e(c)(2). This is meant to ensure that sellers are paid in full from the proceeds derived from the re-sale of the produce. Under the statute, the trust is formed at the moment the produce is shipped to the buyer and remains in effect until the seller is paid in full. *See* 7 C.F.R. § 46.46(c)(1); *In re Kornblum & Co.,* 81 F.3d 280, 286 (2d Cir.1996) (agreeing with creditors' position that trust is formed upon sale of produce); *Matter of Snyder,* 184 B.R. 473, (D.Md.1995). The buyer—in this case Dong or both Kingdom and Dong—therefore becomes a trustee and "has a fiduciary obligation under PACA to repay the full amount of the debt owed to the PACA beneficiary." *C.H. Robinson Co. v. Alanco Corp.,* 239 F.3d 483, 488 (2d Cir.2001). Buyers who dissipate or otherwise spend the proceeds of the trust without making full payment to the seller are in breach of their fiduciary duties. That much is clear. The wrinkle in this case is deciding whether Kingdom is also a buyer/trustee, or whether Dong is the only liable corporate party.[5]

Kingdom is a New York corporation formed in November 1990. (Mo Aff., Exh. A.) While its certificate of incorporation lists New York County as the location of the corporate office, Mr. Mo testified that Kingdom shares an office with Dong at 41–25 Kissena Boulevard in Flushing, Queens, (Dec. 26 Tr. at 17–18, 31), a fact confirmed by Kingdom's bank statement, which also bears the Flushing address. Kingdom's principal place of business, 1350 Lafayette Avenue, appears to be the Hunts Point Market in the Bronx. Dong was incorporated in May 2002, and has its corporate office at 41–25 Kissena Boulevard, in Flushing, Queens. (Mo Aff., Exh. B.) It appears that while it was in business,[6] Dong also operated out of the Hunts Point Market, and its bank statements list 1350 Lafayette Avenue as its address. According to Mr. Mo, Kingdom is in the business of importing food, while Dong purchases produce domestically. (Mo Aff. ¶ 4.)

The parties' business relationship began in the Spring of 2002. At that time, Dong did not have a PACA license, and therefore was not able to purchase or sell produce.[7] *See* 7 U.S.C. § 499c(a); Mo. Aff. ¶ 5. Due to this circumstance, Mr. Mo claims that plaintiffs, and other produce suppliers, agreed to sell produce to Dong,

---

5. The parties do not dispute that Dong was a purchaser, and is liable under PACA. In fact, it consented to the continuation of the Temporary Restraining Order. (*See* Dec. 26 Tr., at 73.)

6. According to Mr. Mo, Dong is no longer buying or selling produce; it is in liquidation. (Dec. 26 Tr. at 20–21, 59–60, 66, 74–75.)

7. It is undisputed that at all relevant times both plaintiffs as well as Kingdom had valid PACA licenses.

but bill Kingdom because it had a PACA license. (Mo Aff. ¶¶ 5–6.) Likewise, customers of Dong would pay Kingdom, which would deposit the proceeds of Dong's sales into its (Kingdom's) account, and then issue its own check to Dong. (*See* Pl. Exh. 3). It appears that this was typical of defendants' practice in July and August 2002. Mr. Mo testified that "before July, [Dong Ku Ra Mi] used Kingdom's name because [it didn't] have a [PACA] license. People [paid] Kingdom—pay [Dong Ku Ra Mi] by Kingdom's name." (Dec. 26 Tr., at 21.) Mr. Mo also stated that after July 2002, although some of Dong's customers began paying Dong directly, other customers continued to pay Kingdom.[8]

Mr. Mo maintains that the "parties had agreed that once Dong received it[s] PACA license that it would then be the purchaser of the commodities sold by Horizon and Venida. The fact remains that it was always Dong which purchased the product and it was always Dong which paid for the product." (Mo Aff. ¶ 6.) In support of this assertion, Mr. Mo produced checks drawn in September and October on Dong's corporate account, payable to each of the plaintiffs.[9] Also, Dong produced handwritten invoices to its customers, ostensibly showing that it sold the produce received from plaintiffs. (Mo Aff., Exh. H.) Thus, Kingdom urges the court not to disregard the separate corporate identity of each company, and recognize that since Kingdom "never sold those commodities . . . . never took custody of those commodities . . . . never received these commodities or received any monies de-

rived from these commodities," it cannot be deemed a PACA trustee in this action. (Mo Aff. ¶ 11.)

Plaintiffs, on the other hand, maintain that when John Chuen contacted plaintiffs in the Spring, he represented that he was with Kingdom, and that plaintiffs agreed to sell only to Kingdom, relying on "Kingdom's name, Kingdom's credit references, which were checked out[, and] Kingdom's license from the USDA to transact the produce sales and purchases." (Transcript of Dec. 18, 2002 Hearing on Order to Show Cause ("Dec. 18 Tr."), at 4–5.) The invoices and bills of lading issued contemporaneously with the sales indicate that the produce was sold and delivered to Kingdom at the Bronx address, (Def. Exhs. B, C), but the invoices attached to plaintiffs' complaint and amended complaint list the buyer as "Kingdom/Dongkurami" at the Flushing address. (Am. Compl., Exhs.A, B.) Plaintiffs explain this discrepancy by acknowledging that they were asked by defendants to modify their records to indicate that Dong, rather than Kingdom, was the buyer, but rejected that request because Dong had "no credit history [and] no credit reference." (Dec. 18 Tr., at 5.) Instead, out of a desire to accommodate defendants, plaintiffs re-issued invoices for sales that had already occurred but listed both Kingdom and Dong as buyer, with the Flushing address, as designated by defendants. (*Id.*) Plaintiffs argue that under PACA, the trust follows the produce, and, regardless of who paid, Kingdom ordered the produce,

---

8. The checks produced by Kingdom at the December 26 hearing bear notations indicating that they were drawn for the purpose described here. Although Mr. Mo testified that this practice occurred only through July 2002, the checks indicate that Kingdom continued to pay Dong in August as well. (*See* Dec. 26 Tr., at 25–26; Plaintiffs' Exhibit 3.)

Since Dong only received its PACA license on or about August 27, 2002, (Mo Aff., Exh. C), the checks written in August merely confirm this method of doing business.

9. It should be noted that none of the invoices noted on those checks include the unpaid invoices that are the subject of this suit.

accepted delivery of the produce, and received the proceeds of the sale of the produce. Whatever arrangement Kingdom and Dong may have had with each other is irrelevant, because as far as plaintiffs were concerned, they were dealing only with Kingdom, believing that "Dong was a division or trade name of Kingdom." (Am.Compl.¶ 7.)

On December 11, 2002, plaintiffs filed a complaint, an application for a temporary restraining order and preliminary injunction, and a memorandum of law in support. On that date, I issued an Order to Show Cause ("Dec. 11 Order") requiring the parties to appear on December 18. On December 17, defendants filed Mr. Mo's affidavit in opposition, arguing that venue was not proper and that plaintiffs' claims against Kingdom ought to be dismissed under Rule 12(b)(6).[10]

On December 18, 2002, the return date of the Order to Show Cause, counsel for defendants informed the court that he was representing all the defendants except Dong. Accordingly, as Dong failed to appear pursuant to my Dec. 11 Order, I issued a Temporary Restraining Order against it, and continued the hearing until December 26, 2002. I also ordered both corporate defendants to produce their financial records from July 2002 through December 2002. Prior to the December 26 hearing, defendants submitted a memorandum of law in support of their position that the corporate identity of each defendant must be kept separate and that only Dong was liable to plaintiffs. On December 26, all parties appeared, but at that time the same defense counsel represented all defendants. The court heard testimony from

Mr. Mo and oral argument on the preliminary injunction application. I continued the TRO against Dong, with its consent, and reserved decision on the injunction against Kingdom.

## DISCUSSION

### I. Jurisdiction and Venue

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because the cause of action arises under federal law, 7 U.S.C. § 499a, *et seq.* In addition, PACA vests jurisdiction in the district courts over "actions by trust beneficiaries to enforce payment from the trust." 7 U.S.C. § 499e(c)(5).

Defendants argue that venue is not proper in this district, as all relevant events occurred in the Bronx, both corporate defendants operate their businesses in the Bronx and the produce was shipped to the Bronx.[11] (*See* Mo Aff. ¶ 10; Dec. 18 Tr., at 13, 30.) I previously ruled that venue was proper in the Eastern District of New York. (Dec. 18 Tr., at 30.) Here, I merely set forth more fully my reasons for that ruling.

Questions of venue in cases such as this one are governed by 28 U.S.C. § 1391(b). Under that provision, actions may be brought in "a judicial district where any defendant resides, if all defendants reside in the same State." 28 U.S.C. § 1391(b)(1). Here, although all defendants reside in New York, the court must also consider the venue rules applicable to corporations. Under 28 U.S.C. § 1391(c),

> a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal

---

10. Defendants requested that the affidavit be treated as a motion to dismiss, but failed to include a memorandum of law because, in their expert opinion, "none need be submitted." (Mo Aff. ¶ 12.)

11. Bronx County is part of the Southern District of New York.

jurisdiction at the time the action is commenced. In a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State.

Thus, the issue of venue turns on whether Kingdom, Dong, or either of them "resides"—that is, subject to personal jurisdiction—in the Eastern District, if it were a separate state. As both corporations are concededly New York corporations, the court must engage in the somewhat artificial process of deciding whether each corporation is subject to personal jurisdiction in Queens County (part of the Eastern District), or Bronx County (part of the Southern District).

■ Dong's residence is obvious from its Certificate of Incorporation. (Mo Aff., Exh. B.) That document states that the office of the corporation is in Queens County, and the address listed for the Secretary of State, as its agent, to mail process is the Flushing address. (*Id.*) Being a domestic corporation (domestic to Queens County, that is), it is subject to general jurisdiction, by virtue of designating the Secretary of State as its agent for service of process. *See Kaufman v. Luzern*, 1996 WL 79322, at *4 (S.D.N.Y. Feb.23, 1996); *see also* N.Y. Business Corporation Law § 304. Such designation "has been equated with a form of constructive consent to personal jurisdiction." *Kaufman*, 1996 WL 79322, at *4 (internal quotation marks and citation omitted). Thus, were the Eastern District of New York a separate state, containing Queens County, Dong would be a domestic corporation subject to general jurisdiction. Accordingly, venue in the Eastern District is proper as to Dong.

■ Kingdom's Certificate of Incorporation lists New York County as the office of the corporation; its principal place of business, according to defense counsel, is in the Bronx. Both of these locations are part of the Southern District. Thus, for purposes of this venue analysis, I regard Kingdom as a foreign corporation in relation to Queens County and the Eastern District.

■ Deciding whether Kingdom is subject to personal jurisdiction in the Eastern District requires an analysis of the New York law on personal jurisdiction. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir.1997) ("In a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules if the federal statute does not specifically provide for national service of process.") (internal quotation marks omitted). In addition to finding jurisdiction under New York law, the court must find that such exercise of jurisdiction "would be permissible under the Due Process Clause of the Fourteenth Amendment." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir.2002).

■ Under New York law, Kingdom may be subject to personal jurisdiction if it is "doing business" in the Eastern District of New York. *See* N.Y. C.P.L.R. § 301; *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57–58 (2d Cir.1985) (noting that C.P.L.R. § 301 "keeps alive the case law existing prior to its enactment, which provided that a corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts"). Kingdom may be found to be subject to

general personal jurisdiction if it "is engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction." *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir.1990) (internal quotation marks and citation omitted). To sustain this finding, Kingdom must do business in the Eastern District "not occasionally or casually, but with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915 (1917) (Cardozo, J.) (quoted in *Landoil Resources Corp.*, 918 F.2d at 1043). The factors considered in this determination include "the existence of an office in [the Eastern District]; the solicitation of business in [the Eastern District]; the presence of bank accounts or other property in [the Eastern District]; and the presence of employees or agents in [the Eastern District]." *Landoil Resources Corp.*, 918 F.2d at 1043.

 The federal due process analysis requires a finding that Kingdom's contacts with the Eastern District are sufficient "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Bank Brussels Lambert*, 305 F.3d at 127 (quotation marks and citations omitted). In order to sustain a finding of general jurisdiction in the Eastern District, Kingdom's contacts must be "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

Application of these principles to Kingdom's activities in Queens County and the Eastern District indisputably supports a finding of personal jurisdiction, and therefore venue, in this court. Mr. Mo testified that Kingdom shares an office with Dong in Flushing, Queens. (Dec. 26 Tr., at 17, 31.) Moreover, both corporations apparently have employees in Queens, as process was served and accepted at the Flushing address on behalf of both corporate defendants. Mr. Mo testified that he signs checks at the Flushing office. (*Id.*) Kingdom also maintains a bank account at a Citibank branch located in Flushing, and had, until recently, another bank account at an Asia Bank branch also located in Flushing. (*Id.* at 12.) Kingdom has a listing in the Queens, but not the Bronx, phone directory. Finally, it should be noted that although Kingdom's Certificate of Incorporation lists New York County as the site of the corporate headquarters, a recent visit to the New York Secretary of State's website [12] disclosed an address in Flushing as the site of the executive office and the address for service of process. Thus, pursuant to C.P.L.R. § 301, Kingdom is undoubtedly doing business in the Eastern District, which subjects it to personal jurisdiction. Furthermore, its contacts with the Eastern District are continuous and systematic, thus satisfying the requirements of Due Process. Accordingly, venue, for Kingdom, is likewise proper in the Eastern District.

## II. Preliminary Injunction

### A. *Standard for Injunctive Relief*

 The now well-established standard in the Second Circuit for obtaining a preliminary injunction requires a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d

---

**12.** http:// wdb.dos.state.ny.us/corp—public/ corp—wdb.corp—search—inputs.show.

70, 72 (2d Cir.1979) (per curiam). That standard applies with equal force in cases, such as this one, brought under PACA for injunctive relief. *See JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990). Plaintiffs have amply demonstrated that the risk of irreparable harm is present, and that they are likely to succeed on the merits.

■ First, the irreparable harm in this case, as in other PACA cases, is the risk that a produce buyer will have dissipated the PACA trust without paying the produce seller, thus leaving the produce seller out of luck and out of money. Indeed, the protection of produce sellers from this predicament was one of the main reasons cited by Congress in enacting the trust provisions of PACA. Congress recognized that most produce sellers are small businesses which are "least able to withstand the losses" that result from dissipation of trust assets through late payment or business failure. H.R.Rep. No. 98–453, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406. Moreover, because of a seller's economic position, if he "cannot realize any returns on the sale of the crop when due, he may not be able to survive." *Id.* In this case, this danger has already materialized in that Dong is no longer in business and is in the process of liquidating its assets, which consist of approximately $80,000 in receivables to be shared between plaintiffs and six other creditors. (*See* Dec. 26 Tr., at 73–75.) Accordingly, the court finds that there is a substantial risk of further irreparable harm and that injunctive relief is necessary to preserve the status quo.

■ Plaintiffs have also demonstrated a likelihood of success on the merits in order to obtain injunctive relief. Under PACA, a seller loses the benefits of the statutory trust unless it informs the buyer of its intention to preserve its entitlement to the trust proceeds. *See* 7 U.S.C. § 499e(c)(3). Notice under the statute may be given by "ordinary and usual billing or invoice statements," which must include specific language informing the buyer of the seller's intention to preserve its rights to the trust. 7 U.S.C. § 499e(c)(4). Both plaintiffs and defendants have PACA licenses and are therefore subject to the statute. Plaintiffs have submitted unpaid invoices, all of which bear the exact language required by the statute, thus satisfying the notice requirement and preserving their interest in the trust. Moreover, that plaintiffs are entitled to payment is not in dispute. No one has questioned, for instance, whether the produce that was delivered and accepted conformed to the relevant agreements. Having provided produce as required, and not having been paid as agreed, plaintiffs have established their entitlement to payment under PACA. The only issue in dispute is the identity of the buyer. Thus, the likelihood of plaintiffs' success on the merits, as to at least one—if not both—of the corporate defendants, is practically unquestioned.[13]

### B. *Identity of the Produce Buyer*

1. Invoices and Bills of Lading

■ The documentary evidence offered in this case establishes that Kingdom purchased the produce at issue and is a PACA trustee. First, it is undisputed that Kingdom was the original buyer, since Dong

---

13. That defendant Kingdom challenges *its* obligation to pay, and thus argues that plaintiffs have not shown a likelihood of success on the merits as to it, does not alter this portion of the preliminary injunction analysis. I merely point out that once the proper buyer(s) is (are) identified, injunctive relief is appropriate because all of the requirements for such relief have been met.

did not have a PACA license when the parties began their business relationship.[14] Plaintiffs checked Kingdom's credit references and began to sell produce to that company. (*See* Dec. 18 Tr., at 4–5.) Most importantly, however, the invoices and bills of lading [15] issued contemporaneously with the produce shipments indicate that the produce was sold and delivered to Kingdom. (Def.Exhs.B, C.) "A bill of lading describes the goods shipped, sets forth the identity of the shipper (or consignor) and the buyer (or consignee), and directs the carrier to deliver the freight to a certain location or person." *International Knitwear Co. v. M/V Zim Canada,* 1994 WL 924203, at \*3 (S.D.N.Y. Oct.6, 1994). Likewise, the federal Bill of Lading Act, 49 U.S.C. § 80101, *et seq.,* which applies in this case, *see id.* § 80102(3), defines "consignee" as the person in the bill of lading "to whom the goods are to be delivered." *Id.* § 80101(1).

The PACA trust is impressed on produce that is "received" by a merchant, dealer or broker. *See* 7 U.S.C. § 499e(c)(2). PACA regulations define "received" to mean "the time when the buyer, receiver, or agent gains ownership, control, or possession of the perishable agricultural commodities." 7 C.F.R. § 46.46(a)(1). Since Kingdom is the consignee named in the bills of lading, it is the presumptive owner and receiver of the produce, and, hence, a PACA trustee. *See The Carl F. Roses,* 177 U.S. 655, 683, 20 S.Ct. 803, 44 L.Ed. 929 (1900) ("the legal effect of a bill of lading [is] to vest ownership in the consignees"); *Hickman, Williams & Co. v. Murray Transp. Co.,* 31 F.Supp. 820, 822 (S.D.N.Y.1940) (noting

that the consignee listed on a bill of lading is the presumptive owner of the cargo); 49 U.S.C. § 80110(a) ("the carrier must deliver the goods covered by a bill of lading on demand of the consignee named in a non-negotiable bill").

▮ In addition to the bills of lading, the original invoices produced by defendants also indicate that Kingdom was the purchaser of the produce, and is therefore liable to plaintiffs. Under the statutory scheme, a seller must give notice of its intent to preserve the benefits of the trust to the buyer. *See* 7 U.S.C. § 499e(c)(3). Such notice may be given through the seller's "ordinary and usual billing or invoice statements." *Id.* § 499e(c)(4). PACA regulations define "ordinary and usual billing or invoice statements" to mean "communications customarily used *between parties to a transaction* in perishable agricultural commodities in whatever form, documentary or electronic, for billing or invoicing purposes." 7 C.F.R. § 46.46(a)(5) (emphasis added). Thus, PACA clearly envisions that invoices presumptively indicate both the seller and the buyer for the purpose of preserving the seller's right to the trust assets received by the buyer.

Furthermore, in enacting the 1995 amendments to PACA, Congress eliminated the requirement that sellers file their notice with the United States Department of Agriculture. Under the 1995 amendments, sellers "may use standard invoices or other billing statements to provide notice *to the buyer* of intent to preserve trust benefits in the event that payment is late

---

**14.** Counsel for plaintiffs also stated that the person who first contacted plaintiffs represented that he was from Kingdom. (*See* Dec. 18 Tr., at 4.) That statement, however, was contradicted by Mr. Mo. (*See* Dec. 26 Tr., at 9.) Although I make no finding on this point

at this stage in the proceedings, this is an issue that ought to be explored further by the parties during discovery.

**15.** The bills of lading at issue here were non-negotiable.

or the payment instrument is not honored." H.R.Rep. No. 104–207, at 9 (1995), *reprinted in* 1995 U.S.C.C.A.N. 453, 456 (emphasis added). Congress intended the new amendments to "strengthen and improve the operation of the trust." *Id.* Moreover, it is clear that Congress intended "the effect of notice provided through the use of usual billing or invoice statements to be the legal equivalent to the [then-]current practice of providing notice subsequent to the payment date by means independent of the billing statement or invoice." *Id.* at 9–10, 1995 U.S.C.C.A.N. at 456–57. Thus, PACA clearly assigns a vital function to the invoice used by a seller precisely because the party named in such invoice (which serves to give notice), is the PACA trustee to whom notice must be given.

Kingdom's argument that the name of the entity in a bill or invoice has no bearing on the identity of the PACA trustee wholly eviscerates PACA's notice provisions, and leaves sellers who use invoices without the benefit of the trust. Under Kingdom's view, sellers wishing to preserve their interest in the PACA trust could not rely on their "ordinary and usual billing or invoice statements" but would have to follow the produce to determine who actually received it. That result turns the statutory scheme on its head and is clearly inconsistent with the language of the statute, whose intent was to provide "convenience and cost savings to the unpaid supplier." H.R.Rep. No. 104–207, at 9, *reprinted in* 1995 U.S.C.C.A.N. at 456.

Finally, if Kingdom's designation in the invoice as buyer was erroneous and wrongly subjected it to the fiduciary duties associated with being a trustee, one would have expected a reasonable business person to take steps to correct such an important mistake and have sufficient documentation to prove it. The only evidence presented was Mr. Mo's testimony that he told Dong's suppliers and customers (but not plaintiffs specifically) to correct their records to indicate that Dong was the entity purchasing and selling produce instead of Kingdom.[16] Even if there were testimony that plaintiffs were informed that they were invoicing the wrong party, it is doubtful that such testimony standing alone and unaccompanied by documentary proof, would be admissible under the parol evidence rule. *See Tray–Wrap, Inc. v. Meyer,* 1994 WL 710804, at *4 (S.D.N.Y. Dec.20, 1994) (stating that "where PACA is silent as to a material part of the transaction at issue, the provisions of the [New York] UCC apply"); *Sunkyong America, Inc. v. Beta Sound of Music Corp.,* 199 A.D.2d 100, 101, 605 N.Y.S.2d 62, 63 (1st Dep't 1993) ("The parol evidence rule embodied in UCC 2–202 bars the introduction by the defendant of proof of any alleged oral agreement between the parties which would vary the terms of the plaintiffs' invoices, which were the final written expression of the parties' sales agreement.").

The court recognizes that defendants are correct in their observation that the invoices annexed to plaintiffs' pleadings are not the same invoices that were issued when the produce was shipped. The original invoices, as noted above, listed Kingdom International at the Bronx address, as the buyer. (*See* Def. Exhs. B, C.) By contrast, the invoices annexed to the pleadings listed "Kingdom/Dongkurami" at the Flushing address, as the buyer. Plaintiffs' explanation for this discrepancy is that after they refused defendants' request to change the account solely to Dong's

---

**16.** Although counsel for defendants informed the court that Mr. Mo told plaintiffs that they were invoicing the wrong party, (*see* Dec. 26 Tr., at 71), counsel's statement is not evidence.

name, they added Dong as an accommodation. (*See* Dec. 18 Tr., at 5.) But even these corrected or amended invoices—or, as defense counsel calls them, "contrived and manufactured" invoices—never *eliminated* Kingdom as a purchaser; they merely *added* Dong. Defense counsel emphatically and continuously argues that these invoices somehow indicate that "plaintiffs always dealt with Dong directly." (Defendants' Memorandum of Law, at 3.) But counsel never explains—nor could he without perverting logic and common sense—how the addition of a new party to plaintiffs' invoices, without elimination of the previous party, demonstrates that the newly added party was always the party with whom plaintiffs dealt.[17]

### 2. Kingdom's Other Evidence

Kingdom's other arguments are similarly wrongheaded and need not detain the court very long.

Kingdom's main argument is that Dong was the purchaser all along, and only it should be subject to the preliminary injunction. In support of this contention, Kingdom offers checks drawn on Dong's account to plaintiffs as payment for earlier shipments of produce, handwritten invoices ostensibly showing that Dong sold produce received from plaintiffs, (*see* Mo Aff., Exh. H), and extensive legal argument concern-

ing the doctrines of corporate separateness and piercing the corporate veil.

First, as a general matter, Kingdom would have this court believe that it was Dong—not Kingdom—that received the produce shipments in the Bronx. Curiously, however, no evidence to support this was offered. Indeed, as both Kingdom and Dong had facilities in the Bronx to receive shipments, and since a corporation can only act through its employees and agents, the court is left to wonder why no testimony was offered concerning whether employees of Dong or of Kingdom actually signed for the produce and took possession of it.[18] Without evidence to the contrary, the court must rely on the documentary proof before it.[19]

I also note that PACA regulations require receivers of produce to maintain records on all produce received. Such records

> shall clearly show for each lot the date of arrival and unloading; whether received by freight, express, truck, or otherwise; the car initials and number; the truck license number and the driver's name or the name of the trucking firm; the number of packages or the quantity received; the kind of produce; *the name and address of the consignor or seller;* whether the produce was purchased;

---

**17.** Counsel's musings only serve to obfuscate the issue, without providing a scintilla of legal support or rational argument for his position. The following statement is indicative of counsel's confused reasoning in this matter: "These original invoices, Your Honor, for the record say Kingdom International, 1350 Lafayette Avenue in the Bronx. There is nothing on these invoices to show Kissena Boulevard in Flushing or to show Kingdom at all." (Dec. 26 Tr., at 12.)

**18.** The court notes that some of the bills of lading produced by defendants bear a signature of a person whose last name is Lee. Although no testimony was elicited as to who

signed for the produce, Mr. Mo also indicated that a Jackie Lee works for Kingdom. (*See* Dec. 18 Tr., at 26.) This, too, is an issue to be developed further by the parties through formal discovery.

**19.** Although Mr. Mo testified that "Kingdom never received the shipments from the plaintiffs," (*see* Dec. 26 Tr., at 17), he did not say which *individuals* actually signed the bills of lading to take possession of the produce. His statement that a *corporation* received the produce is a non sequitur, since a corporation cannot physically do anything without its employees or agents.

consigned or received on joint account; *and the disposition of the produce,* whether jobbed or sold in carlots or trucklots, and the lot number assigned to the shipment by the receiver (as required by § 46.20).

7 C.F.R. § 46.18 (emphasis added). No such records were produced by either corporate defendant.

■ Next, Kingdom offers Dong's corporate checks to indicate that it paid for some purchases and was therefore always the buyer. Although this is certainly evidence that Dong was involved in the transactions, Kingdom has not directed the court to any authority stating that a party paying for produce is, *ipso facto,* the *only* buyer to whom PACA liability attaches. The checks can certainly demonstrate that Dong was *a* buyer, but that issue is not in dispute. Without additional discovery, the court cannot say that these checks were the only checks tendered to plaintiffs by any of these defendants. Nor can I conclude that Kingdom did not also pay for certain shipments. Also, since Mr. Mo testified that Kingdom transferred funds to Dong, it is not at all clear whose funds Dong was expending even though its checks were used. More importantly, these checks do not, in any way, undermine the legal effect of the invoices and bills of lading. The checks do not preclude, for example, a finding that Kingdom ordered the produce and received the produce, and then transferred it to Dong to make payment. In fact, prior to Dong receiving its PACA license, this is exactly what the defendants were doing.

■ Kingdom also offers handwritten invoices indicating that Dong sold the produce and received the proceeds from such sales. (Mo Aff., Exh. H.) As a result, Kingdom argues, Dong is the proper trustee because it has control of the trust assets, namely, the proceeds from the sale of

the produce. Alas, Kingdom is wrong again. First, the trust is impressed not only on the proceeds derived from the sale of produce, but on the produce itself. *See* 7 U.S.C. § 499e(c)(2); 7 C.F.R. § 46.46(b). Therefore, while selling the produce is sufficient for a party to be considered a PACA trustee, nothing in the statute or the regulations absolves the buyer or receiving party—whether or not it sold the produce—from its obligation to make full payment. Thus, even if Dong sold the produce, Kingdom, as noted above, is still liable as purchaser and receiver of the produce.

■ Second, the invoices contain handwritten descriptions of the type of produce sold, the quantity, the unit price, the total amount of sale, the date, and the customer. The invoices conform to most of the requirements listed in the "Sales tickets" section of the PACA regulations. *See* 7 C.F.R. § 46.19. However, there is no indication on the invoices that the particular produce sold was the same produce received from plaintiffs. Thus, Dong's invoices merely show that it sold produce. But that fact is not in dispute. Rather, Dong's burden is to show that the produce it sold was the same produce received from plaintiffs. The Second Circuit has cited with approval cases from other jurisdictions that place the burden on the buyer to demonstrate the source of the trust assets. *See In re Kornblum & Co.,* 81 F.3d 280, 287 (2d Cir.1996) (citing with approval *Sanzone–Palmisano Co. v. M. Seaman Enterprises, Inc.,* 986 F.2d 1010, 1012 (6th Cir.1993); *Six L's Packing Co. v. West Des Moines State Bank,* 967 F.2d 256, 258 (8th Cir.1992)). Had Dong complied with PACA regulations requiring that a "lot number shall be entered on the receiving record in connection with each shipment and entered on all sales tickets identifying and segregating the sales from

the various shipments on hand" its burden of proof would have been easier. 7 C.F.R. § 46.20. Without such evidence or additional discovery, I cannot make this determination.

■ Kingdom's final argument, and one on which it appears to rely principally, is that plaintiffs are urging the court to hold Kingdom liable for the acts of Dong, an entirely separate corporate entity. Kingdom argues forcefully, but mistakenly, that a finding that Kingdom is liable is tantamount to piercing the corporate veil and disregarding the separate corporate identity of each corporation. Kingdom has even provided the court with a memorandum of law (of sorts) on the subject. Unfortunately, Kingdom's reliance on this argument puts the proverbial cart before the horse. The law of piercing the corporate veil applies when a party wishes to hold an individual or a related corporation liable for the acts of another corporation. Kingdom's position, however, is grounded on the erroneous premise that only Dong is liable, and it would be wrong to require Kingdom to answer for Dong's debts. As this discussion has demonstrated, Kingdom has its own, independent basis for liability to the plaintiffs. Accordingly, Kingdom's argument, at least at this stage, is unavailing.

After more thorough discovery, Kingdom may very well demonstrate that it was never a purchaser of the produce in question. Then, and only then, will its argument on piercing the corporate veil justify the court's attention, assuming plaintiffs dispute Kingdom's lack of involvement. For now, however, it is premature to consider whether one corporation should be held liable for the debts of another. Kingdom is, of course, free to raise this issue again on a more fully developed factual record.

## III. Individual Liability

The court notes that several courts in this circuit and others, have held that in PACA cases, individuals who are principals in corporations which bought produce, but failed to pay, are individually liable for breach of their fiduciary duties. *See, e.g., Bronia v. Ho,* 873 F.Supp. 854, 861 (S.D.N.Y.1995); *A & J Produce Corp. v. CIT Group/Factoring, Inc.,* 829 F.Supp. 651, 655 (S.D.N.Y.1993); *Mid–Valley Produce Corp. v. 4–XXX Produce Corp.,* 819 F.Supp. 209, 212 (E.D.N.Y.1993); *Morris Okun, Inc. v. Harry Zimmerman, Inc.,* 814 F.Supp. 346, 348 (S.D.N.Y.1993). Accordingly, should either corporate defendant be found to be insolvent, Mr. Mo, as principal of both corporations, may be held liable to plaintiffs. At this point, however, I make no finding as to any individual liability, nor does the preliminary injunction issued herein affect Mr. Mo's personal assets.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction, pursuant to Fed.R.Civ.P. 65, against both Dong and Kingdom is GRANTED. Because defendants already possess all of the PACA trust assets that are the subject of this action, the bond in this matter is hereby set at $0.00. Defendant Kingdom's motions to dismiss for improper venue, and pursuant to Fed.R.Civ.P. 12(b)(6) are DENIED without prejudice to renewal upon a more complete factual record. The preliminary injunction is annexed to this Memorandum and Order and is deemed incorporated by reference.

SO ORDERED.